# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

**LINDA CHILDS-PIERCE,**

       **Plaintiff,**

       **v.**

**UTILITY WORKERS UNION OF
AMERICA,**

       **Defendant.**

</td><td>

**Civil Action No. 03-1271 (JDB)**

</td></tr>
</table>

## MEMORANDUM OPINION

In this action brought pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., and Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("§1981"), plaintiff Linda Childs-Pierce claims that she was the victim of racial discrimination, retaliation, and a hostile work environment by defendant Utility Worker's Union of America ("UWUA" or "Union").[1]  Defendant and plaintiff have submitted cross-motions for summary judgment on all claims.[2]  For the reasons explained below, the Court grants summary judgment in favor of defendant on all claims.

---

[1] Plaintiff initially filed a claim of age discrimination and retaliation pursuant to the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq., but withdrew the claim at the motions hearing held on July 7, 2005.

[2] Defendant has also moved to strike plaintiff's March 23, 2005 affidavit on the grounds that the filing of an affidavit in a reply brief is untimely and that it contradicts the evidence and testimony in plaintiff's own summary judgment briefs.  The Court discourages attempts to create new issues of material fact by submitting affidavits in reply papers that could have been introduced earlier.  See Reetz v. Jackson, 176 F.R.D. 412, 414 (D.D.C. 1997) (quoting Mack v. United States, 814 F.2d 120, 124 (2d Cir. 1987) ("[A] party's affidavit which contradicts [her] own prior deposition testimony should be disregarded on a motion for summary judgment.").  However, plaintiff's affidavit is not inconsistent with her earlier testimony and therefore defendant's motion is denied.

## BACKGROUND[3]

Plaintiff, a female African-American, began her employment with defendant UWUA as a senior document data secretary in March 1997 in the Washington, D.C. office.  Am. Compl. ¶¶ 11, 12.  Plaintiff was hired by John Walsh, who was then serving as the UWUA's National Secretary-Treasurer.  Id. ¶ 13.  In 1999, Walsh was replaced as National Secretary Treasurer by Gary Ruffner.  Def. Mem, Ex. A, Gary Ruffner Declaration ("Ruffner Decl.") ¶ 2.  During the period of alleged discriminatory conduct, plaintiff was the only African-American employee working at the Washington, D.C. office.  Pl. Mem., Ex. 3, Gary Ruffner Deposition, Mar. 16, 2004 ("Ruffner Dep. I") at 97-98.  The other employees in Washington included Ruffner, a Caucasian; Rosanna Farley, a Caucasian office manager; Barbra Bennett, a Caucasian head booker; Theodora ("Teddi") Morris, a Caucasian bookkeeper; and Cheryl Mansfield, a Caucasian senior document data secretary.  Id.; Pl. Mem., Ex. 2, Gary Ruffner Deposition, Sept. 8, 2004 ("Ruffner Dep. II") at 4-5, 10; Pl. Mem., Ex. 4, Def. Resp. to Pl. Interrog. No. 2.  The Washington office was small, thus there were no strict job duties for each employee.  Ruffner Dep. I at 68-69.  Ruffner acted in a supervisory role with respect to all the staff at the Washington office.  Def. Resp. to Pl. Interrog. No. 3.

In July 2002, a couple who had received a letter from plaintiff on UWUA letterhead, Joseph and Joy Freeman, contacted Ruffner and informed him that plaintiff had been using company letterhead in communications related to her administration of an estate settlement.  Ruffner Decl. ¶ 11.  In particular, the Freemans, who had a financial interest in the estate,

---

[3] The facts summarized in this section are not in dispute.  For ease of reference, the Court will refer to plaintiff's memorandum in support of her motion for summary judgment as "Pl. Mem." and defendant's memorandum in support of its motion for summary judgment as "Def. Mem."

accused defendant of allowing plaintiff to use the letterhead so that she might exert undue influence over certain potential beneficiaries of the estate.  Id.  On August 14, 2002, Ruffner provided plaintiff with a letter that asserted that she had engaged in various actions involving the estate which were not consistent with her obligations as a UWUA employee and may have resulted in an adverse impact on the Union, and specifically cited her use of UWUA letterhead without authorization or approval for personal business, performance of work in her role as administrator of an estate on work time, and her charging of long distance phone calls, with respect to this estate, on company telephone lines.  Pl. Mem., Ex. 5, Letter of Aug. 14, 2002 from Ruffner to Childs-Pierce.  The letter further alleged that plaintiff failed to comply with Ruffner's earlier request to provide defendant with copies of all correspondence that she sent out from the office on company letterhead.  Id.

On August 16, 2002, a disciplinary hearing was held regarding the allegations in Ruffner's August 14th letter, at which plaintiff admitted to using UWUA letterhead and other company resources in administering the estate.  Def. Mem., Ex. B, Pl. Admissions ¶¶ 10, 11. Shortly thereafter, defendant learned that plaintiff had requested security tapes to discover the identity of the third party who complained about the use of letterhead, despite being specifically told by Ruffner that the Freemans' identity was being withheld to protect them from any retaliation in the settlement of the estate.  Pl. Mem., Ex. 6, Letter of Aug. 30, 2002 from Ruffner to Childs-Pierce ("Suspension Letter").  Citing the foregoing instances of misconduct, defendant imposed a five-day unpaid layoff on plaintiff beginning on September 3, 2002.  Id.  On September 16, 2002, plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging that her disciplinary suspension was a result of discrimination based on her race and age.  Pl. Mem., Ex. 8, Charge of Discrimination of Sept. 16, 2002.

In November of 2002, while preparing pension-related documents for UWUA's actuary, Ruffner noticed that plaintiff's personnel file contained documentation with three different birth dates.  Ruffner Decl. ¶ 15.  Two documents listed plaintiff's birth date as November 28, 1953. One document listed her birth date as November 28, 1954, and another document listed her birth date as November 28, 1993.  Id.  On November 18, 2002, Ruffner, together with Barbra Bennett, who served as shop steward for Local 2 members employed at UWUA, approached plaintiff to inquire about these differences.  Id. ¶16.  During this conversation, Ruffner requested that plaintiff submit a copy of her birth certificate to verify her correct birth date.  Id.

Three days after her conversation with Ruffner about her birth date, on November 21, 2002, plaintiff presented UWUA office manager Rosanna Farley with a letter from her treating physician, Dr. Gladys Hammond, indicating that plaintiff was under her care and unable to come to work for the next three to four weeks due to job-related stress.  Pl. Mem., Ex. 9, Letter of Nov. 20, 2002 from Hammond; Am. Compl. ¶ 26.  Ruffner reviewed the letter and informed plaintiff that the letter was not sufficient to authorize sick leave.  Ruffner Dep. I at 110-111.  Ruffner requested that plaintiff provide defendant with more information, such as diagnosis and prognosis, in order to verify her medical condition.  Id.  Plaintiff left work after speaking with Ruffner and did not report to work thereafter.  Id.  She amended her EEOC charge of discrimination on that same day to include Ruffner's inquiry about her birth certificate and his statement that he would require more information to support her request for sick leave.  Pl. Mem., Ex. 8, Charge of Discrimination Amendment of Nov. 20, 2002.  She later amended her EEOC complaint on December 2 and 31, 2002, citing defendant's repeated requests for specific medical documentation and the opening of a letter by a co-worker as additional evidence of racial

and age-based discrimination. Pl. Mem., Ex. 8, Charge of Discrimination Amendment of Dec. 2,

2002 & Charge of Discrimination Amendment of Dec. 31, 2002.

On December 12, 2002 UWUA general counsel Joanne Goldstein sent a letter to

plaintiff's counsel, Nathaniel Johnson, seeking further information in support of plaintiff's

request for sick leave.  Def. Mem., Ex. G, Joanne Goldstein Declaration ("Goldstein Decl.") at

Ex. 1, Letter of Dec. 12, 2002 from Goldstein to Johnson.  The letter specifically requested the

following information: "the diagnosis, a comprehensive treatment plan, the basis on which the

diagnosis/treatment plan precludes Ms. Childs-Pierce from working during treatment and any

additional information that would assist the Employer in evaluating Ms. Child-Pierce's claim for

sick leave." Id.  In response to this request, defendant received a note from Dr. Hammond dated

December 13, 2002 indicating that plaintiff was to remain under the doctor's professional care as

plaintiff was still unable to work.  Pl. Mem., Ex. 11, Letter of Dec. 13, 2002 from Hammond.

On December 27, 2002, defendant acknowledged receipt of Dr. Hammond's medical note but

reiterated the request for more specific medical information.  Pl. Mem., Ex. 12, Letter of Dec. 27,

2002 from Goldstein to Hammond.  In particular, defendant stated that in order for plaintiff to

obtain sick leave and/or pay, Dr. Hammond would have to prepare a "comprehensive medical

report." Id.

On January 13, 2003 Dr. Hammond forwarded to defendant a letter stating that plaintiff

was currently being treated for "Generalized Anxiety Disorder." Goldstein Decl. at Ex. 4, Letter

of Jan. 13, 2002 from Hammond to Goldstein.  Defendant responded to the letter on January 27,

2003 explaining that the diagnosis and diagnosis code, by itself, was insufficient for defendant to

evaluate plaintiff's request for sick leave.  Id. at Ex. 5, Letter of Jan. 27, 2003 from Goldstein to

Hammond.  Further, defendant stated that if the specified medical information requested was not

provided by the close of business February 3, 2003, defendant would begin to review the options available with respect to plaintiff's employment status.  Id.

On February 13, 2003,  Johnson provided defendant with a letter from Dr. Hammond indicating that plaintiff "continues to exhibit severe symptoms of depression and anxiety caused by environmental work related stress.  She is not able to return to work yet and cannot return until her emotions and behaviors are stabilized with psychotherapy and psychopharmacological medication."  Id. at Ex. 7, Letter of Feb. 13, 2003 from Johnson to Goldstein.  The letter also stated that plaintiff was under the care of a psychiatrist and that she "might" be able to return to work on March 17, 2003.  Id.  Later that month, on February 26, 2003, plaintiff amended her EEOC charge of discrimination one final time to include a claim of retaliation based on defendant's denial of sick leave and repeated requests for medical documentation.  Pl. Mem., Ex. 8, Charge of Discrimination Amendment of Feb. 26, 2003.

Once again believing plaintiff had failed to provide adequate responses to its requests for specified medical documentation, defendant informed plaintiff on March 7, 2003 that defendant had made an appointment for plaintiff "to be evaluated by an outside, independent physician." Pl. Mem., Ex. 16, Letter of Mar. 7, 2003 from Goldstein to Childs-Pierce.  The letter further stated that, upon receiving a report from the independent medical examiner ("IME"), defendant would "make a determination of employment status and a decision on whether she is entitled to pay for the last several months." Id.

On March 13, 2003, defendant received a letter from Johnson stating that plaintiff was unwilling to meet with the IME, but would "consult with a psychologist of her own choosing and provide [UWUA] with another prognosis of her anticipated return to work date." Goldstein Decl. at Ex. 10, Letter of Mar. 13, 2003 from Johnson to Goldstein.  On March 31, 2003, having

received no further information from plaintiff or her attorney regarding plaintiff's appointment with the IME or her own psychologist, defendant sent a letter to Johnson instructing plaintiff to schedule an appointment with the IME no later than the close of business on April 2, 2003.  Id. at Ex. 11, Letter of Mar. 31, 2003 from Goldstein to Johnson.  In particular, the letter stated that plaintiff's failure to schedule an appointment would "constitute insubordination" and result in the termination of plaintiff's employment with UWUA.  Id.

At the close of business on April 2, 2003, defendant received a letter from Johnson stating that plaintiff would be returning to work on April 7, 2003.  Id. at Ex.12, Letter of April 2, 2003 from Johnson to Goldstein.  The letter did not indicate that plaintiff had complied with defendant's instructions that she meet with an IME, and defendant soon discovered that she in fact had failed to do so.  On April 3, 2003, defendant terminated plaintiff's employment. Pl. Mem., Ex.17, Letter from Walsh to Childs-Pierce of April 3, 2003 ("Termination Letter").  In its termination letter, defendant cited the reasons for plaintiff's termination as her "consistent pattern of failure to cooperate with, and refusal to follow direct orders of, the employer," including "fail[ure] to properly and adequately document [her] alleged inability to work due to medical/psychological conditions, . . . refus[al] to comply with the UWUA's directive to be evaluated by [an IME]," and failure to "provide a birth certificate due to the inconsistent dates of birth."  Id.

## ANALYSIS

## I.   Analytical and Legal Framework

### A.   Summary Judgment Standard

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment

as a matter of law."  Fed.R.Civ.P. 56(c).  The party seeking summary judgment bears the initial

responsibility of demonstrating the absence of a genuine dispute of material fact.  See Celotex

Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party may successfully support its

motion by "informing the district court of the basis for its motion, and identifying those portions

of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material

fact."  Id. (quoting Fed.R.Civ.P. 56(c)).

        In determining whether there exists a genuine issue of material fact sufficient to preclude

summary judgment, the court must regard the non-movant's statements as true and accept all

evidence and make all inferences in the non-movant's favor.  See Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 255 (1986).  A non-moving party, however, must establish more than the

"mere existence of a scintilla of evidence" in support of its position.  Id. at 252.  By pointing to

the absence of evidence proffered by the non-moving party, a moving party may succeed on

summary judgment.  Celotex, 477 U.S. at 322.  "If the evidence is merely colorable, or is not

significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50

(internal citations omitted).  Summary judgment is appropriate if the non-movant fails to offer

"evidence on which the jury could reasonably find for the [non-movant]."  Id. at 252.

## B.    The *McDonnell Douglas* Framework

        The Court analyzes plaintiff''s racial discrimination and retaliation claims under Title VII

and § 1981 pursuant to the familiar burden-shifting analysis set out in McDonnell Douglas Corp.

v. Green, 411 U.S. 792 (1973).  See Carney v.  American Univ., 151 F.3d 1090, 1092-93 (D.C.

Cir.  1998) (noting that "to evaluate claims under 42 U.S.C. § 1981 . . . courts use the three-step

McDonnell Douglas framework for establishing racial discrimination under Title VII," and

assuming without deciding that a claim of retaliation is authorized under § 1981 and subject to the same framework).[4]  First, a plaintiff has the burden of establishing a prima facie case of discrimination or retaliation by a preponderance of the evidence.  Id. at 802; Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).  In order to make out a prima facie case of discrimination, a plaintiff must show that "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." Stella v. Mineta, 284 F.3d 135, 145 (D.C. Cir. 2002) (quoting Brown v. Brody, 199 F.3d 446, 452 (D.C. Cir. 1999)).  To establish a prima facie case of retaliation a plaintiff must show: "(1) that she engaged in statutorily protected activity, (2) that the employer took an adverse personnel action; and (3) that a causal connection existed between the two." Mitchell v. Baldrige, 759 F.2d 80, 86 (D.C. Cir. 1985) (quoting McKenna v. Weinberger, 729 F.2d 783, 790 (D.C. Cir. 1984)); Brody, 199 F.3d at 452.

If the plaintiff establishes a prima facie case, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions.  McDonnell Douglas, 411 U.S. at 802.  The employer's burden, however, is merely one of production.  Burdine, 450 U.S. at 254-55.  The employer "need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." Id.

If the employer is successful, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext for discrimination or retaliation.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000).  The plaintiff "may attempt to establish that he

---

[4] This Court also assumes without deciding that a retaliation claim is authorized under § 1981.  Defendant has not raised this issue, and as explained in this opinion, the Court has dismissed the claim on other grounds.

was the victim of intentional discrimination 'by showing that the employer's proffered

explanation is unworthy of credence.'" Id. (quoting Burdine, 450 U.S. at 256).  But "[p]roof that

the defendant's explanation is unworthy of credence is simply one form of circumstantial

evidence that is probative of intentional discrimination." Reeves, 530 U.S. at 147.  Thus, the

trier of fact may also "consider the evidence establishing the plaintiff's prima facie case 'and

inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is

pretextual.'" Id. (quoting Burdine, 450 U.S. at 255 n.10).  "Whether judgment as a matter of law

is appropriate in any particular case will depend on a number of factors . . . includ[ing] the

strength of the plaintiff's prima facie case, the probative value of the proof that the employer's

explanation is false, and any other evidence that supports the employer's case and that properly

may be considered on a motion for judgment as a matter of law." Reeves, 530 U.S. at 148-49.

As the D.C. Circuit has explained:

> Assuming then that the employer has met its burden of producing a
> nondiscriminatory reason for its actions, the focus of proceedings at trial (and at
> summary judgment) will be on whether the jury could infer discrimination from
> the combination of (1) the plaintiff's prima facie case; (2) any evidence the
> plaintiff presents to attack the employer's proffered explanation for its actions;
> and (3) any further evidence of discrimination that may be available to the
> plaintiff (such as independent evidence of discriminatory statements or attitudes
> on the part of the employer) or any contrary evidence that may be available to the
> employer (such as evidence of a strong track record in equal opportunity
> employment).

Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc); see also

Waterhouse v. District of Columbia, 298 F.3d 989, 992-993 (D.C. Cir. 2002).

Although the "intermediate evidentiary burdens shift back and forth" under the

McDonnell-Douglas framework, "'[t]he ultimate burden of persuading the trier of fact that the

defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'"

Reeves, 530 U.S. at 143 (quoting Burdine, 450 U.S. at 253).  Once the defendant has proffered a

legitimate non-discriminatory reason for its action, then, the question is whether that proffered reason is a pretext for discrimination, and at this point the <u>McDonnell Douglas</u> shifting burdens framework disappears, the sole remaining issue is discrimination <u>vel</u> <u>non</u>, and "to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason."  <u>Lathram v. Snow</u>, 336 F.3d 1085, 1088 (D.C. Cir. 2003); <u>see</u> <u>Reeves</u>, 530 U.S. at 142-43.  Examination of that issue in this setting therefore requires consideration of all the relevant circumstances in evidence, including the strength of the prima facie case, any direct evidence of discrimination, any circumstantial evidence that defendant's proffered explanation is false (which may be enough with the prima facie case to infer unlawful discrimination), and any properly-considered evidence supporting the employer's case.  <u>Reeves</u>, 530 U.S. at 147-48; <u>see also</u> <u>Teneyck v. Omni Shoreham Hotel</u>, 365 F.3d 1139, 1151 (D.C. Cir. 2004); <u>Lathram</u>, 336 F.3d at 1089; <u>Waterhouse</u>, 298 F.3d at 993; <u>Aka</u>, 156 F.3d at 1290.

## II.    <u>Discussion</u>

### A.    **Racial Discrimination Claims**

Plaintiff, an African-American, alleges that she was subjected to disparate treatment based on her race and color in violation of Title VII and § 1981.  Her claims are based on two series of events: those surrounding her August 2002 disciplinary suspension for misuse of UWUA resources, and those surrounding her November 2002 request for sick leave, subsequent denial of sick leave, and ultimate termination for failing to provide medical information and submit to an IME.  Examining each claim independently, none survives summary judgment.

### 1.      Suspension for Misuse of Company Resources

Plaintiff asserts that she was subjected to discriminatory disparate treatment when she was suspended for five days without pay for her personal use of UWUA resources.  In particular, plaintiff alleges that similarly situated white employees in the UWUA Washington office engaged in the same conduct but did not face similar disciplinary action.  It is not disputed that plaintiff is a member of a minority group and that she was suspended, thus establishing two elements of a prima facie case for disparate treatment.  However, plaintiff is unable to establish the third element of her prima face case because there is no evidence in the record to support an inference that her disciplinary suspension was the product of racial discrimination.

Plaintiff seeks to establish an inference of discrimination by demonstrating that similarly situated employees outside the plaintiff's protected class engaged in offenses of comparable seriousness, yet were treated more favorably.  See Pl. Mem. at 10.  Evidence demonstrating that similarly situated employees outside of plaintiff's protected class were treated more favorably is sufficient to establish an inference of discrimination.  See Holbrook v. Reno, 196 F.3d 255, 261 (D.C. Cir. 1999).[5]  In order to show that she was similarly situated to a fellow employee, plaintiff must "demonstrate that all of the relevant aspects of [their] employment situation [are] nearly identical."  Neuren v. Adduci, Mastriani, Meeks & Schill, 43 F.3d 1507, 1514 (D.C. Cir. 1995).  In particular, the co-workers "must have dealt with the same supervisor, have been subject to the

_____

[5] In her briefs, plaintiff states that she is challenging Holbrook because "she need not show she was similarly situated to other employees in order to establish an inference of discrimination based on disparate discipline." Pl. Opp. at 12.  However, the Court interprets her brief to actually challenge the proper scope of the similarly situated standard.  In her view, "employees' duties and related considerations are irrelevant," and instead the focus should be on the nature of offenses committed.  Id.  The Court agrees that in a case alleging disparate treatment in discipline, the focus of the analysis should be on the nature of the offenses committed, but as discussed above, disagrees that the employees' duties and the identity of the supervisor are wholly irrelevant.

same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Phillips v. Holladay Property Serv., 937 F. Supp. 32, 37 (D.D.C. 1996).  The nature of the offenses committed and the nature of the punishments imposed are the most significant variables in a case alleging discrimination in connection with disciplinary actions. See Moore v. City of Charlotte, 754 F.2d 1100, 1105 (4th Cir. 1985) (quoting McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 283 (1976)) ("an allegation that other 'employees involved in acts against [the employer] of *comparable seriousness* . . . were nevertheless retained . . . is adequate to plead an inferential case'") (emphasis in original) ; Holbrook, 196 F.3d at 261 (comparable employee was not similarly situated because plaintiff's "offenses -- lack of forthrightness and disobedience -- and immature behavior are hardly of 'comparable seriousness'").

Here, plaintiff alleges that her five-day disciplinary suspension gives rise to an inference of discrimination because several other UWUA employees, including Ruffner, Farley, Morris, Mansfield, and Bennett, regularly used UWUA letterhead and envelopes for personal reasons and did not face disciplinary action for this conduct.  See Pl. Mem. at 13-14.  Further, plaintiff claims to be similarly situated to her co-workers because the Washington office is small, thus there are no strict job duties for each employee.  See Ruffner Dep. I at 68-69.  Ruffner also acts in a supervisory capacity with respect to all the staff and has the authority to facilitate and impose disciplinary action upon other employees who used UWUA resources for personal reasons.  See Pl. Mem., Ex. 4, Def. Resp. to Pl. Interrog. No. 9.

Although plaintiff appears to be similarly situated to her white co-workers with respect to job duties and supervision, the most important variable in a similarly situated analysis for a case alleging discriminatory disciplinary action is whether the offenses are comparably serious.  See

Holbrook, 196 F.3d at 261.  Plaintiff is not similarly situated for purposes of her discrimination claim because there is a significant distinction between her use of UWUA letterhead in the administration of an estate and her co-workers' use of UWUA letterhead.[6]  Plaintiff admittedly used company letterhead to send letters to potential estate beneficiaries in her role as estate administrator.  See Suspension Letter.  The other UWUA employees used company letterhead to send letters to family and friends, and sometimes used company envelopes to mail bills.  Pl. Mem, Ex.1, Childs-Pierce Deposition ("Childs-Pierce Dep.") at 116.   Moreover, plaintiff made no efforts to cover the actual letterhead when using it for estate purposes, while her co-workers consistently used white-out or tape to cover the letterhead when sending out personal letters unrelated to UWUA business.  Id.  Finally, plaintiff was the only employee whose use of company letterhead resulted in a third party approaching defendant and questioning its involvement in employees' outside business affairs.  See Ruffner Decl. ¶ 11.

Based on the facts above, it is clear that plaintiff's offense is comparably more serious and that she is therefore not similarly situated to her co-workers with respect to misuse of company resources.  Plaintiff's use of company letterhead as part of her administration of an estate is more serious than her co-workers' general use because it had the potential of drawing

_____

[6] In attempting to demonstrate that plaintiff is not similarly situated to other employees, defendant repeatedly argues in its briefs that plaintiff's use was comparably more serious because she used company letterhead in the conduct of a "private, for-profit enterprise," whereas other UWUA employees used company letterhead to send personal notes to family and friends. See Def. Opp. at 10.  The Court does not rely on the "for-profit" characterization of plaintiff's conduct as a distinguishing characteristic of the offense because it is not well-supported by the record, nor was it cited in the suspension letter.  See Perkins v. Brigham & Women's Hosp., 78 F.3d 747, 751 (1st Cir. 1996) (proffered justification must be based on information the employer knew and relied upon at the time it decided to take the adverse employment action).  Rather, the Court finds plaintiff's misuse of company letterhead as comparably more serious than her co-workers' use because, as stated above, there were aggravating factors associated with plaintiff's misuse, including the risk of drawing defendant into an outside legal matter.

the UWUA into an outside legal matter.  In contrast, there is no evidence suggesting that the

other UWUA employees' use of letterhead to communicate with members of their intimate social

network put defendant at similar risk.  Defendant's suspension letter also identifies other actions

demonstrating a level of dishonesty and disobedience which enhances the seriousness of

plaintiff's offense.  See Suspension Letter.  Plaintiff failed to furnish defendant with a complete

copy of all letters sent on company letterhead and requested security videotapes in order to

ascertain the identity of the third party who approached defendant despite explicitly being told

not to do so.  Id.  These actions further differentiate her from other UWUA employees.

Accordingly, this Court concludes that plaintiff has failed to demonstrate an inference of

discrimination in respect to her five-day suspension for misuse of company resources and

summary judgment must be granted in favor of defendant on this claim.[7]  Morever, even if

plaintiff had established a prima facie case of discrimination, there is no evidence on the basis of

which a reasonable trier of fact could find defendant's legitimate non-discriminatory

justifications for suspending plaintiff -- the seriousness of the offenses -- are pretextual, for the

same reasons stated above.

---

[7] Plaintiff argues that even if her personal use of company letterhead is distinguishable
from other employees' personal use of company letterhead, she has still been subjected to
disparate treatment by defendant for using other company resources including "defendant's time
for personal matters, long distance telephone calls, postage, and other office materials."  Pl.
Reply at 8.  However, as noted in all three letters related to plaintiff's suspension, plaintiff was
disciplined for her use of company resources only insofar as they were being used to perform
work in her role as administrator of the estate. See Pl. Mem., Ex. 5, Letter of Aug. 14, 2002 from
Ruffner to Childs-Pierce; Def. Reply, Ex. B, Letter of Aug. 21, 2002 from Ruffner to Childs-
Pierce; Suspension Letter.  There is no evidence indicating that other UWUA employees who
used office materials or made long distance phone calls were doing so in relation to a comparable
matter.  Therefore, plaintiff is not similarly situated to other UWUA employees with respect to
misuse of other company resources.

2.      **Denial of Sick Leave, Requests for Medical Documentation and Independent Medical Examination, and Termination**

Plaintiff next alleges that she was subjected to discriminatory disparate treatment based on the denial of sick leave and the requests for medical documentation and an independent medical examination ("IME"), which ultimately culminated in her termination.  In particular, plaintiff claims that three similarly situated white UWUA employees were granted extended sick leave without having to provide extensive medical documentation or undergo an IME.  On these claims, plaintiff can establish a prima facie case of discrimination.  As an African-American, she is a member of a protected class based on her race and color, and she suffered adverse employment actions when she was denied sick leave, and subsequently terminated in connection with the medical documentation and IME requests.  These adverse employment actions give rise to an inference of discrimination because three other UWUA employees outside of plaintiff's protected class were granted extended sick leave without being asked to provide extensive medical documentation or undergo an IME.  The employees had similar duties and reported to the same supervisor.  They also requested sick leave of comparable periods -- in the range of two to three months.  Therefore, they are sufficiently similar to establish an inference of discrimination for purposes of plaintiff's prima facie case.[8]

Because plaintiff has established a prima facie case of discrimination, the burden shifts to defendant to produce a legitimate non-discriminatory reason for denying plaintiff sick leave, requesting additional medical documentation, ordering plaintiff to undergo an IME and

---

[8] Defendant argues that plaintiff is not similarly situated to these employees because there was a special need for verification of an illness from an employee in plaintiff's situation.  The Court believes defendant's argument pertains primarily to its proffered legitimate non-discriminatory reason for treating plaintiff differently and not to the assessment of the merits of plaintiff's prima facie case.  For this reason, the Court considers defendant's arguments in the later stages of the <u>McDonnell Douglas</u> framework.

terminating plaintiff in connection with the medical documentation and IME requests. Defendant has submitted evidence that plaintiff was initially denied sick leave and ordered to provide various forms of medical documentation because defendant was unable to verify the legitimacy of plaintiff's alleged ailment based on the brief note provided by Dr. Hammond.  See Ruffner Dep. I at 110-111.  Support for the veracity of plaintiff's sick leave request was significant to defendant because plaintiff had a history of dishonesty that made defendant more doubtful of the veracity of her claim.  See Suspension Letter.  Defendant has also provided evidence that plaintiff's failure to comply with its various requests for medical verification and to undergo an IME constituted insubordination and resulted in its decision to terminate plaintiff's employment.  See Termination Letter.  Thus, defendant has satisfied its burden of production and the remaining question is whether defendant's articulated reasons were a pretext for discrimination.

Plaintiff relies on the same evidence put forth in her prima facie case to demonstrate that defendant's reasons for denying plaintiff sick leave and ultimately terminating her employment are pretextual.  Plaintiff alleges that three other UWUA employees -- specifically, Morris, Penny and Dorn, who are all Caucasians -- were granted extended sick leave without being asked to provide additional medical documentation and undergo an IME.  See Childs-Pierce Dep. at 91-92, 97.  Plaintiff argues that in 2000, Morris took extended sick leave for over three months and was not required to provide defendant with medical documentation.  See Ruffner Decl. ¶ 19.  In addition, plaintiff points to Penny, who was out on sick leave for eight weeks in late 1997.[9]  See

_____

[9] It should be noted that when Penny took extended sick leave in 1997 she was under the direct supervision of John Walsh, then National-Secretary Treasurer of UWUA.  See Ruffner Decl. ¶ 19.  Plaintiff was under the direct supervision of Ruffner, Walsh's successor, at the time her sick leave request was denied.  Id. ¶ 3.  In order to show that plaintiff is similarly situated to

(continued...)

id.; Def. Mem., Ex. A, Attendance History for Evelyn Penny.  Lastly, plaintiff claims that Dorn was granted extended sick leave for a sleep disorder and chest pains during the same time period plaintiff was out on sick leave without being required to provide medical verification prior to taking leave.  See Ruffner Decl. ¶ 19.

In determining whether summary judgment is appropriate in a particular case the Court will look to a number of factors, "includ[ing] the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law."  Reeves, 530 U.S. at 148-49.  In attempting to meet the pretextual burden, plaintiff has merely reiterated the argument put forth in her prima facie case concerning similarly situated co-workers.  She has proffered no additional evidence to demonstrate that defendant's articulated reasons were a pretext for discrimination.  Taking all appropriate inferences in favor of plaintiff, the Court finds that plaintiff has failed to meet her burden of establishing pretext by a preponderance of the evidence.

One way in which a plaintiff can attempt to demonstrate that an employer's proffered non-discriminatory justification is a pretext for discrimination is to present evidence that a similarly situated individual of another race was treated more favorably.  See Neuren, 43 F.3d at 1513-14.  Plaintiff attempts to prove pretext by showing that Morris, Penny, and Dorn were similarly situated and treated more favorably.  However, the similarities between plaintiff, Morris

---

[9](...continued)
the non-minority employees to which she is comparing herself, she must "demonstrate that *all of the relevant aspects* of her employment situation [were] 'nearly identical.'" Neuren, 43 F.3d at 1514 (emphasis added). Thus, the fact that plaintiff and Penny did not deal with the same supervisor with respect to their requests for extended sick leave deems them not similarly situated for purposes of this claim. Nonetheless, as discussed above, the Court concludes that Penny and plaintiff are not similarly situated on other grounds as well.

and Penny discussed earlier -- requests by administrative staff for extended sick leave, submitted

to the same supervisor -- are insufficient at this stage of the inquiry to demonstrate defendant's

justification is pretextual because Morris's and Penny's specific medical conditions left no

potential for doubt as to the veracity of their claims for sick leave.  Morris took extended sick

leave in order to have back surgery, and Penny took extended sick leave to have hip replacement

surgery.  See Ruffner Decl. ¶ 19.  In contrast to Morris and Penny, who both evidenced signs of

physical illness prior to and during their initial requests for sick leave, plaintiff failed to exhibit

any visually verifiable signs of her ailment, later defined as generalized anxiety disorder.  See id.

¶ 23.  Indeed, plaintiff's initial note requesting leave did not even indicate the nature of her

medical problem--it simply stated that she was under Dr. Hammond's "professional care" and

that she would not be able to return to work for three to four weeks.  See Pl. Mem., Ex. 9, Letter

of Nov. 20, 2002 from Hammond.  Therefore, for purposes of this claim, the Court finds that

plaintiff is not sufficiently similarly situated to Morris or Penny to establish defendant's proffered

justification is pretextual.[10]

Nor are the similarities between plaintiff and Dorn sufficient to establish that defendant's

justification is a pretext for discrimination.  Like plaintiff, Dorn's illness was not visually

verifiable at the time sick leave was requested; however, defendant did not require Dorn to

---

[10] The veracity of Morris' and Penny's illnesses was also evidenced by their claims for reimbursement of out-of-pocket medical expenses under defendant's expense reimbursement program and insurance claims for medical treatment.  See Ruffner Decl. ¶ 19.  While it is true that plaintiff did not have health insurance through defendant and therefore would not be expected to submit the same paperwork as Morris and Penny, the Court still views their submission of various medical documents as pertinent in the similarly situated analysis because the documents served to verify the legitimacy of the employees' ailments.  In the cases of Morris and Penny, defendant was able to verify the veracity of their illnesses through two means: visual observation and reimbursement forms related to medical expenses incurred by the illness.  Plaintiff's ailment was neither visually verifiable nor documented at a detail equivalent to the insurance paperwork filed by Morris and Penny.

provide medical documentation proving the veracity of her claim contemporaneous with her request for sick leave as it did in the case of plaintiff.  <u>See</u> Ruffner Decl. ¶ 20.  Rather, Dorn submitted reimbursement and insurance claims to defendant verifying the legitimacy of her illness nearly three weeks after she had taken sick leave.  <u>See</u> Def. Mem., Ex. A, Attendance History of Carol Dorn & Copy of July 10, 2002 medical bill.  The temporal disparity in defendant's requests for medical documentation from plaintiff as compared to Dorn arguably weakens the credibility of defendant's proffered explanation that it must verify sick leave claims before authorizing paid sick leave.

Nonetheless, plaintiff is still unable to establish that defendant's reasons are pretextual because she has no evidence disputing defendant's other articulated reason that medical documentation was necessary in plaintiff's situation -- unlike the other employees, plaintiff possessed a record of misconduct which implicated her standing as an honest employee.  Neither Dorn nor Morris and Penny had been disciplined while employed at UWUA.  <u>See</u> Ruffner Dep. I at 148.  In contrast, plaintiff had a record of misconduct, and more specifically, a record of dishonesty which provided defendant with a legitimate reason to doubt the veracity of plaintiff's request for sick leave.  <u>See</u> Suspension Letter.  Just three months prior to her request for sick leave, plaintiff had disobeyed defendant's instruction not to inquire into the identity of the third party who reported her use of UWUA letterhead.  <u>Id.</u>  In addition, plaintiff failed to provide defendant with a complete copy of all documents she sent on UWUA letterhead.[11]  <u>Id.</u>  Plaintiff's

---

[11] Defendant cites inconsistent birth dates on personnel documents submitted by plaintiff as another example of plaintiff's dishonesty.  <u>See</u> Def. Opp. at 14.  Plaintiff claims that she was not responsible for the discrepancy in birth dates.  <u>See</u> Def. Mem., Ex. B, Pl. Resp. to Def. Interrog. No. 39-49.  Whether or not plaintiff was in fact responsible for the inconsistent birth dates, there is no evidence to disbelieve defendant's statement that it relied on the discrepancies as an additional factor which placed plaintiff's credibility in further doubt at the time she

(continued...)

disciplinary history with defendant is a relevant factor that distinguishes her from the three other

UWUA employees to whom she attempts to compare herself.  See, e.g., Perkins, 78 F.3d at 751

(plaintiff not similarly situated to an employee who lacked a record of disciplinary problems);

Kidane v. Northwest Airlines, Inc., 41 F. Supp. 2d 12, 17-18 & n.8 (D.D.C. 1999) (employees

not similarly situated where no evidence that they had the same history of disciplinary problems);

Carolina v. Kaiser Found. Health Plan of the Mid-Atlantic States, 1990 WL 20045, at *5 (D.D.C.

1990) ("employer may [] consider aggravating or mitigating factors among employees when

taking action or inaction").  Thus, the fact that Dorn was given a substantially greater amount of

time to provide medical documentation as compared to plaintiff is not evidence that defendant's

medical documentation justification is pretext. [12]  For these reasons, the Court finds that the

similarities between plaintiff and Morris, Penny, and Dorn are insufficient to establish that

defendant's proffered justification for treating plaintiff differently is a pretext for discrimination.

Plaintiff has failed to come forward with any other evidence that a reasonable jury could find

discredits defendant's proffered non-discriminatory reasons for denying plaintiff sick leave,

requiring medical documentation for the request, and ultimately terminating her employment.

---

[11](...continued)
requested sick leave.  See Fischbach v. District of Columbia Dept. of Corr., 86 F.3d 1180, 1183
(D.C. Cir. 1996) (quoting McCoy v. WGN Cont'l Broad. Co., 957 F.2d 368, 373 (7th Cir. 1992)
("the issue is not 'the correctness or desirability of [the] reasons offered . . . [but] whether the
employer honestly believes in the reasons it offers'")).

[12] One other fact that appears to further support defendant's argument that plaintiff and
Dorn are not similarly situated is their employment in different offices.  Dorn was employed in
UWUA's Braintree, Massachusetts office.  See Ruffner Decl. ¶ 19.  However, the record lacks
any information as to the level of communication between the Braintree and Washington offices
and Ruffner's involvement in affairs outside of Washington headquarters.

B.      **Retaliation**

Plaintiff also claims that she was subject to retaliation for filing a charge of

discrimination with the EEOC.  To establish a prima facie case of retaliation, a plaintiff must

show: "(1) that she engaged in statutorily protected activity, (2) that the employer took an adverse

personnel action; and (3) that a causal connection existed between the two."  Mitchell, 759 F.2d

at 86 (quoting McKenna v. Weinberger, 729 F.2d 783, 790 (D.C. Cir. 1984)).   The first two

elements are easily met.  It is undisputed that plaintiff engaged in protected activities when she

filed an EEOC complaint on September 16, 2002, which was amended on November 21, 2002;

December 2 and December 31, 2002; and February 26, 2003. Moreover, most of the retaliatory

actions alleged -- requests for medical documentation, denial of sick leave, and termination of

employment -- are plainly adverse employment actions. [13]

The parties thus focus their dispute on whether plaintiff has established causation, the

third element of the prima facie case for retaliation.  A plaintiff may establish causation by

demonstrating a close temporal proximity between an employer's knowledge of protected

activity and an adverse employment action. See Clark County Sch. Dist. v. Breeden, 532 U.S.

268, 273 (2001).  The case law is mixed as to how close the temporal proximity must be to

establish causation.  See Mitchell, 759 F.2d at 86-87 (three month span sufficient to establish a

causal connection); Castle v. Bentsen, 867 F. Supp. 1, 3 (D.D.C. 1994) (three to five months

---

[13]  Plaintiff seems to suggest that defendant's request for a birth certificate supports an
independent claim of retaliation.  See Pl. Mem. at 17; Pl. Opp. at 18; Pl. Reply at 16-17.
However, the complaint does not reference a request for a birth certificate, and more importantly,
a request, by itself, for a birth certificate does not constitute an adverse employment action. See
Stewart v. Evans, 275 F.3d 1126, 1134 (D.C. Cir. 2002) (quoting Walker v. WMATA, 102 F.
Supp. 2d 24, 29 (D.D.C. 2000) ("An employment decision does not rise to the level of an
actionable adverse action . . . unless there is a tangible change in the duties or working conditions
constituting a material employment disadvantage.").  To the extent that the request is part of
plaintiff's termination claim, the Court will address it accordingly.

short enough to establish a causal connection). But see Kipp v. Missouri Highway & Transp. Comm'n, 280 F.3d 893, 897 (8th Cir. 2002) (interval of two months "so dilute[d] any inference of causation that [the Court] is constrained to hold as a matter of law that the temporal connection" is not satisfied); Baker v. Potter, 294 F. Supp. 2d 33, 41 (D.D.C. 2003) ("two month gap is not sufficient to establish the temporal proximity necessary to show a causal connection"). Here, the adverse employment actions occurred within, at most, nine weeks after the protected activity.  Considering the nature of the protected activity -- multiple EEOC filings -- and the severity of the adverse employment actions, nine weeks is sufficient to establish causation.

Because plaintiff has established a prima facie case, the burden shifts to the defendant to articulate legitimate non-discriminatory reasons for its adverse employment actions.  Defendant has again come forward with the same legitimate, non-discriminatory reasons for denying plaintiff sick leave and ultimately terminating her employment as it did for plaintiff's discrimination claim.  Defendant argues that plaintiff failed to provide sufficient means to verify the legitimacy of her claim for extended sick leave, and continually refused defendant's requests for additional medical documentation and an IME.  See Ruffner Dep. I at 110-111.  Further, defendant points to evidence indicating that plaintiff had a history of misconduct that implicated her standing as an honest employee, and in turn, caused defendant to doubt the truthfulness of plaintiff's sick leave request.  See Suspension Letter.  Finally, defendant contends that plaintiff's failure to comply with these requests constituted insubordination and resulted in its decision to terminate plaintiff's employment.  See Termination Letter.

Plaintiff responds with the same evidence offered in her discrimination claims to prove pretext.  In particular, plaintiff alleges that she is similarly situated to three other UWUA employees who were allowed to take extended sick leave without providing defendant with

extensive medical documentation or an IME.  See Childs-Pierce Dep. at 91-92, 97.  However, as

the Court has already found above, there are significant differences between plaintiff and those

employees that are fatal to plaintiff's attempt to establish pretext.  Unlike plaintiff, Morris and

Penny both evidenced signs of physical ailments prior to and at the time they requested sick leave

that enabled defendant to visually verify their claims.  See Ruffner Decl. ¶ 19.  Dorn's and

plaintiff's situations bear some similarities, including lack of a visually verifiable illness, but

unlike plaintiff, Dorn did not have a history of dishonesty which would have caused defendant to

doubt the veracity of her sick leave claim.  See Ruffner Dep. I at 148.  The Court therefore finds

that defendant's proffered legitimate non-discriminatory reasons for denying plaintiff sick leave

and terminating her are not a pretext for retaliation because, as with the discrimination claims,

plaintiff was not sufficiently similarly situated to those treated more favorably.

> **C.**     **Hostile Work Environment**

To establish a prima facie case of hostile work environment, plaintiff must demonstrate

that: (1) she is a member of a protected class; (2) she was subject to unwelcome harassment; (3)

the harassment occurred because of her race or disability; (4) the harassment affected a term,

condition or privilege of employment; and (5) the employer knew or should have known of the

harassment, but failed to take any action to prevent it.  See Jones v. Billington, 12 F. Supp. 2d 1,

11 (D.D.C. 1997), aff'd, 1998 WL 389101 (D.C. Cir. June 30, 1998).  However, the workplace

environment becomes "hostile" for purposes of Title VII and legal relief only when the offensive

conduct "permeate[s] [the workplace] with discriminatory intimidation, ridicule, and insult that is

sufficiently severe or pervasive to alter the conditions of the victim's employment and create an

abusive working environment."  Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81

(1998); accord Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993); see also Breeden, 532

U.S. at 270-271; Holbrook, 196 F.3d at 262.

The key terms, then, are "severe," "pervasive," and "abusive," as not just any offensive or

discriminatory conduct rises to an actionable hostile work environment.  Under Faragher v. Boca

Raton, 524 U.S. 775, 787-88 (1998), in order to determine whether a work environment is

sufficiently hostile to be actionable under Title VII, a court should consider: (1) the frequency of

the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically

threatening or merely offensive; and (4) whether the conduct reasonably interferes with the

employee's performance.

> These standards for judging hostility are sufficiently demanding to ensure that Title
> VII does not become a "general civility code."  Properly applied, this will filter out
> complaints attacking "the ordinary tribulations of the workplace, such as the
> sporadic use of abusive language, gender-related jokes, and occasional teasing."

Id. at 787 (citations omitted); see also Breeden, 532 U.S. at 271 ("simple teasing, offhand

comments, and isolated incidents (unless extremely serious)" are insufficient); Neuren, 43 F.3d at

1513.

Moreover, it must be clear that the hostile work environment was the result of

discrimination based on a protected status.  As the Second Circuit has explained:

> Everyone can be characterized by sex, race, ethnicity, or (real or perceived)
> disability; and many bosses are harsh, unjust, and rude.  It is therefore important
> in hostile work environment cases to exclude from consideration personnel
> decisions that lack a linkage of correlation to the claimed ground of
> discrimination.  Otherwise, the federal courts will become a court of personnel
> appeals.

Alfano v. Costello, 294 F.3d 365, 377 (2d Cir. 2002).  Thus, "to sustain a hostile work

environment claim . . . [plaintiff] must produce evidence that she was discriminated against

because of her [status]."  Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 440

(2d Cir. 1999) (claim for hostile work environment failed where only three of fifteen alleged

incidents had racial overtones); see also Farmer v. Cleveland Pub. Power, 295 F.3d 593, 605 (6th

Cir. 2002) ("[A] racial or sexual hostile work environment claim is cognizable only if the

purported harassment, viewed in conjunction with all of the circumstances, occurred because of

the employee's race or gender."); Hardin v. S.C. Johnson & Son, Inc., 167 F.3d 340, 345-46 (7th

Cir. 1999) (hostile work environment claim failed where insufficient evidence that the alleged

harassing behavior was motivated by discrimination); Jones, 12 F. Supp. 2d at 12 (hostile work

environment claim failed where plaintiff had "not demonstrated that any of the conduct of which

he complains was related to his race, or that his workplace was permeated with racially

discriminatory behavior").

Here, plaintiff's hostile work environment claim is based on the same set of facts as her

disparate treatment and retaliation claims.  In particular, plaintiff alleges that she was "subject to

unwelcome harassment when she was suspended for five days; denied sick leave; ordered to

provide medical documentation; ordered to undergo an IME; ordered to provide a birth

certificate; ordered to return the office keys prior to her suspension; and terminat[ed]."[14]  Pl.

Mem. at 19.  Further, plaintiff claims that this alleged harassment caused her to suffer "severe

and emotional distress, but not limited to, depression, anxiety, embarrassment, humiliation,

symptoms of physical illness, despair, anger and loss of faith in her employer." Am. Compl. ¶ 72.

Despite these alleged mental and physical effects, these discrete acts of alleged discrimination

---

[14] Plaintiff's first amended complaint also listed denial of training opportunities as an
additional example of harassment.  See Am. Compl. ¶ 70.  The Court believes plaintiff has since
chosen to disregard this event as pertinent to her hostile work environment claim as indicated by
her failure to include denial of training opportunities in her most current briefs on the issue.  In
any event, denial of training opportunities does not support plaintiff's hostile work environment
claim because it is not sufficiently severe or pervasive to create an abusive working environment,
nor is there evidence of racial animus.

and retaliation simply do not rise to the level of severity and pervasiveness necessary to maintain a hostile work environment claim.[15]

Plaintiff relies on three unconnected incidents to support her claim of hostile work environment.  The first is her five-day disciplinary suspension for misusing UWUA letterhead and other resources.  But, as discussed above, the suspension was a legitimate non-discriminatory act brought about by plaintiff's *own* misconduct.  Therefore, plaintiff cannot rely on the suspension, or the fact that she was ordered to return her office keys in connection with that disciplinary action, as evidence of a pervasively hostile work environment.

The second incident on which plaintiff relies is neither extreme nor pervasive.  Ruffner ordered plaintiff to provide UWUA with a birth certificate in order to clarify the discrepancies in her personnel file.  See Ruffner Decl. ¶ 15.  Even assuming, as plaintiff alleges, that Ruffner spoke to her in a "hostile" manner when requesting the birth certificate, Ruffner's tone of voice does not demonstrate that plaintiff was subjected to an illegal hostile work environment.  See Faragher, 524 U.S. at 788 (citing "sporadic use of abusive language" as an "ordinary tribulation of the workplace" that is insufficient as a matter of law for a hostile environment claim); see also Bell, 2005 WL 691865, at *10.  Moreover, defendant had a legitimate, non-discriminatory reason for requesting that plaintiff provide a birth certificate due to the fact that plaintiff's personnel file

---

[15] Defendant argues that plaintiff's claim for hostile work environment under Title VII should be dismissed because plaintiff has not properly exhausted her administrative remedies.  See  Def. Mem. at 28 n.21.  In particular, defendant alleges that plaintiff failed to raise a hostile work environment claim in her EEOC charge or to articulate facts in her charge that could be read to support such a claim.  Id.  The Court disagrees with defendant and finds that plaintiff articulated facts in her charge, and its various amendments, which describe the same conduct and implicate the same individuals such that defendant was on notice that a claim for hostile work environment may be pursued by plaintiff.  See Bell v. Gonzales, 2005 WL 691865, at *10 (D.D.C. 2005) (holding that exhaustion requirement was satisfied even though hostile work environment was not included in formal EEO charge because it related to the conduct alleged in the charge); Jones, 12 F. Supp. 2d at 7.

contained three conflicting birth dates.  Plaintiff has presented no evidence to discredit the legitimacy of defendant's explanation, and hence defendant's request was a non-discriminatory action.

The third incident involves the denial of plaintiff's requests for sick leave and the events surrounding that request, including defendant's subsequent orders that plaintiff provide medical documentation and submit to an IME before being granted sick-leave status.   Once again, because the Court has found that defendant had a legitimate, non-discriminatory reason for denying plaintiff sick leave and requiring her to submit various forms of medical verification, she cannot rely on the denial of sick leave and related events as a basis for her hostile work environment claim.

The Court concludes that plaintiff cannot establish a prima facie case of hostile work environment based on these three incidents.  The events simply are not, individually or collectively, sufficiently severe or pervasive to constitute a hostile work environment claim. Furthermore, the acts fail to satisfy the requirement that plaintiff show a pervasive, severe and *discriminatory* hostile work environment, because the Court has already found the acts to be non-discriminatory.  Indeed, plaintiff's reliance in her hostile work environment claim on the same events that constitute her discrimination claims points out a fundamental problem.  She attempts to cobble together a hostile work environment claim from discrete acts of alleged discrimination against her that are neither severe nor widespread.  Plaintiff has presented no other evidence supporting an inference of racial discrimination, or a severe, pervasive hostility in the workplace, and mere reference to alleged disparate acts of discrimination against plaintiff cannot be transformed, without more, into a hostile work environment claim.  See Lester v. Natsios, 290 F. Supp. 2d 11, 33 (D.D.C. 2003) ("Discrete acts constituting discrimination or retaliation

claims . . . are different in kind from a hostile work environment claim that must be based on severe and pervasive discriminatory intimidation or insult.").  Accordingly, defendant is entitled to summary judgment on plaintiff's claim of a discriminatory hostile work environment.

## CONCLUSION

For the foregoing reasons, the Court holds that plaintiff's claims of racial discrimination, retaliation, and hostile work environment fail.  Accordingly, the Court grants defendant's motion for summary judgment on all claims and denies plaintiff's motion for summary judgment.  The Court also denies defendant's motion to strike plaintiff's affidavit.  A separate order will be issued herewith.


/s/
JOHN D.  BATES
United States District Judge

Date:   August 10, 2005


Copies to:

Nathaniel D.  Johnson
NATHANIEL D.  JOHNSON & ASSOCIATES, L.L.C.
3495 Leonardtown Road
Suite 105
Waldorf, MD 20602
        *Counsel for plaintiff*

Jeffrey R.  Freund
Lauren McGarity
BREDHOFF & KAISER, P.L.L.C.
805 Fifteenth Street, NW
Suite 1000
Washington, DC 20005
        *Counsel for defendant*